PEER *v.* FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF CUMBERLAND

[No. 102, September Term, 1974.]

*Decided February 4, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Ronald C. Brubaker* for appellant.

*Harry I. Stegmaier* and *Daniel F. McMullen, Jr.,* with whom were *Stegmaier, McMullen & Kazary* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

In this appeal from a judgment of the Circuit Court for Allegany County granting a motion for a directed verdict against Mrs. Edward Peer in favor of the First Federal Savings and Loan Association of Cumberland (First Federal), we need decide only one question: whether a contract to provide credit life insurance existed between the parties.

On August 5, 1969, Mr. and Mrs. Edward Peer borrowed $15,000 from First Federal, the loan to be secured by a real estate mortgage. Prior to closing the loan, the Peers received and signed a document entitled:

"Notice to Customers
Required by Federal Law
Federal Reserve Regulation Z."

First Federal used the document (Regulation Z Notice) to comply with the disclosure provisions of the Federal Truth-in-Lending Act, 15 U.S.C.A. § 1601 *et seq.* (1970). The Regulation Z Notice contained a statement disclosing, among other items, the amount of the loan and other charges, including the finance charge expressed as an annual percentage rate, the number of monthly payments required and the monthly amount of principal and interest payments. Under the caption "Insurance," the notice stated:

CREDIT LIFE AND DISABILITY INSURANCE is not required to obtain this loan. No charge is made for credit insurance, and no credit insurance is provided unless the borrower signs the appropriate statement below:

(a) The cost for Credit Life Insurance alone will be $————————— for the term of the credit.

(b) The cost for Credit Life Insurance and Disability Insurance will be $_____ for the term of the credit.

| I desire Credit Life and Disability Insurance. | | I desire Credit Life Insurance Only. | | I DO NOT want Credit Life or Disability Insurance. | |
|---|---|---|---|---|---|
| | | 5 Aug. 1969 | (s) Edward B. Peer | | |
| Date | Signature | Date | Signature | Date | Signature |

Among the other documents signed by the Peers at closing were (1) a loan settlement sheet setting forth various charges; (2) a promissory note fixing the amount of the loan, the interest rate and a monthly payment of $120.84; (3) a contractual rate agreement, required by Maryland Code (1972 Repl. Vol.) Art. 49, § 10, specifying such items as the amount of monthly payment, recording costs and attorney's fees, but leaving blank a space provided for costs of "Life and/or health insurance premiums"; and (4) a mortgage which stated in part:

"It is agreed that the Mortgagee may at its option advance sums of money at anytime for the payment of premiums on any Life Insurance Policy assigned to the Mortgagee or wherein the Mortgagee is the Beneficiary and which is held by the Mortgagee as additional collateral for this indebtedness, and any sums of money so advanced shall be added to the unpaid balance of this indebtedness."

Subsequently, the Peers received a payment coupon book; it stated that the loan payment and total monthly payment was $120.84. The Peers also received an annual statement of their loan account listing payments made on principal, interest, escrow and late charges. No charge was shown for life insurance.

At the time the Peers obtained their loan commitment, a letter was sent to them by First Federal, which stated:

"Ever mindful of the welfare of our members and

endeavoring to be of utmost service to them, we have arranged with one of the prominent life insurance companies of our country to offer a plan of mortgage insurance to cover those of our members who may wish to avail themselves of this protection.

"Unfortunately, we have witnessed cases where misfortune has visited the families of some of our members, and through such loss, the wife and children have been confronted with a real problem in meeting the monthly payments of this mortgage.

"The plan to which we refer, provides for payment of the mortgage debt in full should misfortune befall any of our members covered under the plan. The premium for this coverage will be included in the monthly payment which you will make, if you adopt the plan.

"While this institution is not in the life insurance business, we think the advantages of the plan available to you are of such importance that we have arranged for a representative of the life insurance company underwriting it to call upon you to submit full particulars."

Unfortunately, the letter proved too prophetic in some respects and not enough in others. No life insurance representative ever called upon the Peers and no policy was ever taken on Mr. Peer's life. He died on May 10, 1973. Subsequently, when Mrs. Peer demanded that First Federal pay off the mortgage with the insurance proceeds, she was told that no insurance had ever been provided.

On August 16, 1973, Mrs. Peer, in her individual capacity, sued First Federal, relying solely on the alleged existence of a contract to procure insurance and seeking $10,000 in damages. In granting First Federal's motion for a directed verdict, the lower court (Getty, J.) held that the language relating to life insurance in the Regulation Z Notice form and the mortgage did not create an enforceable contract to provide insurance.

614

We agree that no contract to provide credit life insurance was created between the parties. An essential feature of every contract is the parties' mutual assent, *Post v. Gillespie*, 219 Md. 378, 149 A. 2d 391 (1959), which is crystallized in a certain and definite offer, *Peoples Drug Stores v. Fenton Realty Corp.*, 191 Md. 489, 62 A. 2d 273 (1948), and a knowing and sufficient acceptance, *Buffalo Steel Co. v. Kirwan*, 138 Md. 60, 113 A. 628 (1921). Moreover, it must appear that the terms of the contract are in all respects definitely understood and agreed upon and that nothing is left for future settlement. *Peoples Drug Stores v. Fenton, supra.* Finally, the agreement must be supported by sufficient consideration. *Broaddus v. First National Bank*, 161 Md. 116, 155 A. 309 (1931).

The provision relating to life insurance in the mortgage placed no obligation upon First Federal to procure life insurance, or to advance sums for premiums. Nor does the Regulation Z Notice, standing alone or together with the mortgage, create a binding obligation. The purpose of the Truth-in-Lending Act and the regulations promulgated under it by the Federal Reserve Board is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C.A. § 1601. *See Mourning v. Family Publications Service*, 411 U. S. 356, 93 S. Ct. 1652, 36 L.Ed.2d 318 (1973). The form used by First Federal was not issued by the Federal Reserve Board although the information appearing therein is derived from the Board's "Regulation Z," 12 C.F.R. § 226.4 and § 226.8 (1973).[1]

The federal regulations do not appear to require a lender to include information about credit life insurance on the disclosure form if no charge is made for such an item. *Id.* § 226.4 (a). If a charge is made for life insurance written in

**1.** At the trial, the Treasurer of First Federal testified that the standard form was developed by the Accounting Division of the United States Savings and Loan League. Variations of the form, containing the credit life insurance provision, appear in 5 Am. Jur. *Legal Forms* 2d § 66:24 (1971) and A. Arnold, *Truth-in-Lending and Fair Credit Reporting Forms Guide*, at 403-405 (Banking Law Journal 1971).

connection with the transaction, the premium must be included in the finance charge (expressed as an annual percentage rate) unless:

"(i) The insurance coverage is not required by the creditor and this fact is clearly and conspicuously disclosed in writing to the customer; and

"(ii) Any customer desiring such insurance coverage gives specific dated and separately signed affirmative written indication of such desire after receiving written disclosure to him of the cost of such insurance."

Thus, if First Federal intended to charge for credit life insurance, it would have had to disclose in writing the cost of the policy and include it on the Regulation Z Notice form under the "amount financed"; or else it would have been required to include the premium in the annual percentage rate. Neither was done and neither was required because no charge was made for credit life insurance. If First Federal had charged for life insurance on the basis of such nondisclosure, not only would it have violated federal law but also Art. 49, § 10, which requires a similar disclosure.[2] Moreover, the very language of the Regulation Z Notice form eschews obligation. Mr. Peer only expressed his "desire" for credit life insurance. The other documents in the case, viz., the promissory note, the annual statement of account and the coupon book, reinforce this conclusion. The Peers never paid any premiums for credit life insurance and these documents evidenced that fact. *See Sommers v. Wilson Bldg. & L. Ass'n,* 270 Md. 397, 311 A. 2d 776 (1973).

In *Burgess v. Charlottesville Savings and Loan Ass'n,* 349 F. Supp. 133 (1972), *rev'd on other grounds,* 477 F. 2d 40 (4th Cir. 1973), involving similar contentions with respect to a Regulation Z Notice form, it was said:

---

2. First Federal would also have violated state law if it tried to insure Mr. Peer's life because it had no certificate of authority to act as an insurer as required by Code (1972 Repl. Vol.) Art. 48A, § 42. A director of First Federal served as an agent for the insurance company that arranged for credit life insurance for persons indicating their desire for such coverage, but First Federal itself was not in the insurance business.

"In the instant case, there was no meeting of the minds and the terms of the contract were not clarified. By the depositions, it is evident that the Burgesses' understanding of their duties under a contract to procure insurance was significantly different from Charlottesville Savings and Loan's understanding of those duties. The Regulation Z disclosure statement alone cannot constitute the necessary meeting of the minds because many essential elements of such a contract are plainly missing. No mention is made of the company from which insurance was going to be procured . . . . No mention is made of what duties the Burgesses had, if any, to assist in the procurement of insurance . . . . And no mention is made of the time for performance on the contract, i.e., by what time the insurance was to be procured."

349 F. Supp. at 140.

In *Burgess*, the cost of the credit life insurance was specified on the Regulation Z Notice form and Mr. Burgess died little more than a month after the real estate transaction. Nevertheless, the federal district court concluded:

"It is not the purpose of the Act to require a lending institution to procure credit life insurance or to agree to procure credit life insurance. The separate paragraph on the disclosure statement involving credit life insurance is directly in line with the Act's disclosure purpose since this separate statement shows the borrower that credit life insurance is not required for the loan, is not included in the loan and must be acquired in a separate transaction from the loan transaction. Since the disclosure statement's function is to exchange information and to give both parties notice prior to the contractual relationship, the disclosure statement in and of itself cannot constitute a contractual relationship, and any such agreement must be a result of an

offer and acceptance subsequent to the disclosure."
*Id.* at 141.

It is manifest on the record before us that First Federal did not contract to provide Mr. Peer with credit life insurance and pay the premiums out of the monthly mortgage payments.

*Judgment affirmed; costs to be paid by appellant.*